# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC WILTON BURTON,<br><br>Plaintiff,<br><br>v.<br><br>KEN CLARK, et al.,<br><br>Defendants. | Case No. 1:09-cv-00061-AWI-DLB PC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S SURREPLY (ECF NO. 61)**<br><br>**FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED (ECF No. 53)**<br><br>**OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS** |

**Findings and Recommendations**

## I. Background

### A. Procedural History

Plaintiff Eric Wilton Burton ("Plaintiff") is a prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"). Plaintiff is proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on Plaintiff's first amended complaint against Defendant Ken Clark for violation of the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). On January 17, 2012, Defendant Clark filed a motion for summary judgment. Def.'s Mot. Summ. J., ECF No. 53. Plaintiff filed an opposition on January 27, 2012. ECF No. 56. On January 31, 2012, Defendant filed a reply. ECF No. 57.

On July 12, 2012, Plaintiff was provided the opportunity to file a supplemental opposition to Defendant's motion for summary judgment. ECF No. 65. The Court provided this opportunity in light of the recent decision in *Woods v. Carey*, Nos. 09-15548, 09-16113, 2012 WL 2626912, at *5 (9th Cir. Jul. 6, 2012). Plaintiff must be provided with "fair notice" of the requirements for opposing a motion for summary judgment at the time the motion is brought, and the notice given in this case over two years prior does not suffice. *Id.* On July 24, 2012, Plaintiff filed his response. ECF No. 66. Plaintiff states that he will rely upon his complaint and all other filings. The Court construes this as Plaintiff's notice that he intends to proceed with his opposition filed on January 27, 2012, in which Plaintiff opposed Defendant's motion and generally reasserted his pleadings set forth in his complaint. Pl.'s Opp'n 2:28, ECF No. 56. Thus, the matter is submitted pursuant to Local Rule 230(l).

### B. Defendant's Motion to Strike

On February 17, 2012, Plaintiff filed a reply to Defendant's reply. ECF No. 58. The Court construes this filing as a surreply. On February 23, 2012, Defendant filed a motion to strike the surreply. ECF No. 61. Plaintiff filed objections to Defendant's motion on March 6, 2012. ECF Nos. 62, 63. The matter is submitted pursuant to Local Rule 230(l).

The Local Rules of this Court and the Federal Rules of Civil Procedure do not generally permit the filing of a surreply. *See* L.R. 230(l) (matter is generally submitted after movant files and serves reply). The Court did not request a surreply from Plaintiff. Accordingly, Defendant's motion to strike, filed February 23, 2012, is granted. Plaintiff's surreply is stricken.

## II. Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in

reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* at 324.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2002); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting former Rule 56(e) advisory committee's note on 1963

amendments).

In resolving a motion for summary judgment, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

Finally, to demonstrate a genuine dispute, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586-87 (citations omitted).

### III. Statement of Facts[1]

Plaintiff is a state inmate, serving a life term for attempted first degree murder and is currently incarcerated at High Desert State Prison. Hanlon Decl., Abstract of Judgment; Pl.'s Dep. 5:24-6:1, Oct. 14, 2011.[2] Plaintiff is legally blind, but sees well enough to read and write as well as work in the yard crew wiping tables. Pl.'s Dep. 10:7-17; 11:7-13; 61:10-24; 71:3-20. Plaintiff was incarcerated at the California Substance Abuse Treatment Facility (CSATF) at Corcoran, California from August 23, 2006, to May 19, 2009. Pl.'s Dep. 14:11-15. Defendant Clark was the Warden during Plaintiff's incarceration at CSATF. ECF No. 7 at 2.

In 2008 through 2009, Title 15 required that two religious diet options be afforded inmates: Religious Vegetarian and Jewish Kosher diets. Cal. Code Regs. tit.15, §3054(e); Maurino Decl. ¶

---

[1] All facts are considered undisputed, unless otherwise noted. Pursuant to Local Rule 260(b) and Federal Rule of Civil Procedure 56(c), all disputes with the movant's statement of facts must be supported with citation to evidence. *See* L. R. 260(b) (parties opposing Statement of Undisputed Facts shall deny those that are disputed, "including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission or other document relied upon in support of that denial"). Plaintiff generally declares that his complaint and attached exhibits, and previously filings oppose Defendant's motion. The Court will not speculate as to which portion of the record the nonmoving parties relies upon, nor will it search the entire record for some specific facts that might support the nonmoving party's claim. *United States v. Honeywell Intern., Inc.*, 542 F. Supp. 2d 1188, 1194 (E.D. Cal. 2008). Thus, Defendant's statement of facts is considered undisputed.

Plaintiff also seeks to strike his deposition testimony on several grounds, which the Court will address below.

[2] D. Hanlon is the Correctional Case Records Manager for High Desert State Prison, and maintains Plaintiff's case file. Hanlon Decl., dated Mar. 5, 2010.

Plaintiff contends that he is actually innocent of his conviction. Pl.'s Opp'n 2, ECF No. 56. Plaintiff provides no evidence in support of this contention. Additionally, the constitutionality of Plaintiff's criminal conviction is not at issue in this action. Until Plaintiff demonstrates that his conviction has been overturned, it is considered valid. Plaintiff's objection is denied.

4

4.[3] The general prison population receives the Pork-Free Meal Program. Pork and pork derivatives are not served in CDCR institutions. Maurino Decl. ¶ 5. In the department's research conducted before implementing the Jewish kosher meal, the requirements of Jewish kosher laws were more exacting on the CDCR's food service operation. Kosher food requires separate utensils, dishes, and storage to ensure no contact of meat and dairy foods. This would require a separate kitchen and a kosher kitchen staff, as well as a separate kosher food supplier. *Id.* ¶ 6.

The most effective way to provide kosher food items was as pre-packaged, pre-cooked, shelf-stable entrees so that the meal could be served after simply re-heating it. No food is cooked at the prison kitchen for the Jewish Kosher meal, but re-heated in microwaves or ovens to avoid violating kosher laws. The Jewish Kosher meal is assembled in a separate kitchen area by trained staff. *Id.* For lunch, all inmates get a sack meal. Inmates receiving the Jewish Kosher diet are provided with a separate sack lunch of all kosher items. *Id.*

Religious Vegetarian entrees are cooked separately from meat items to ensure that no meat products are mixed with vegetarian items. If meat is served for lunch, inmates on the Religious Vegetarian diet receive a non-meat protein source. *Id.* ¶ 7. Title 15 provides that any inmate who claims to require a religious diet shall be responsible for completing a CDCR Form 3030, Religious Diet Request, and submitting it to the appropriate institution's Chaplain. The inmate is interviewed by the Chaplain who reads and signs an agreement with the inmate. Cal. Code Regs. tit.15, §3054.3; Maurino Decl. ¶ 3. Title 15 provides that" "Jewish kosher meals shall be available at designated institutions. Jewish inmates may participate in the program, as determined by a Jewish chaplain." As only a Jewish chaplain shall determine an inmate's eligibility for the Jewish Kosher diet, only Jewish inmates may be considered for participation in the diet, per the Jewish chaplain. Maurino Decl. ¶ 4; Cal. Code Regs. tit.15, §3054.2(a), (g).

In March 2007, Chaplin Kulunga, a Muslim Chaplain at CSATF, approved Plaintiff's request for the Jewish Kosher diet and Plaintiff received kosher meals. Pl.'s Dep. 21:18-22; 50:23-53:4. Plaintiff was unhappy with the Jewish Kosher diet because he is "predominately a vegetarian," and

---

[3] L. Maurino is the Departmental Food Administrator for CDCR, responsible for preparing menus for meals served at CDCR institutions. Maurino Decl. ¶ 1. L. Maurino was formerly a dietician at High Desert State Prison. Maurino is familiar with the dietary programs, governing state regulations regarding food policy in CDCR, and the implementation of the standard diet, vegetarian diet, and Jewish Kosher diet. *Id.* ¶ 2.

the Jewish Kosher diet contains red meat.  Pl.'s Dep. 19:4-8, 54:19-55:17; ECF No. 7 at 7.  Plaintiff changed to a vegetarian diet while at CSATF because he did not like the Jewish Kosher meals.  Pl.'s Dep. 54:19-55:17.  Plaintiff wrote in inmate appeal log number SATF-C-08-5154: "Due to the poor quality of the kosher food there had been days where I'd become physically ill with stomach pains and the foul smell utterly made me refuse and since ue to theses reasons which caused me to change to a vegetarian diet." Gomez Decl. (ECF No. 24-2) at 24.[4]  Plaintiff wrote in inmate appeal log number SATF-C-0808-5154: "It is due to my Eighth Amendment Right to food that caused me to change to a kosher vegetarian diet the nutritional quality of the evening meals are poor." ECF No. 24-2 at 21.

The Pork-Free Meal Program for the general population, the Religious Vegetarian diet, and the Jewish Kosher diet are nutritionally comparable. All three meal programs are designed and tested to provide the same range of calories, protein, vitamins, and other nutritional needs of an adult male inmate. There are no nutritionally significant differences in the meal programs. Maurino Decl. ¶ 5.

Plaintiff claimed his kosher meals where tampered with. He wrote in inmate appeal log number SATF-C-08-5154 that the "original seal is always moved by someone."  Pl.'s Dep. 54:19-55:13; ECF No. 24-2 at 21.  Plaintiff admits that he does not know if the unsealed meals were tampered with.  Pl.'s Dep. 54:21-55:8.

On September 8, 2008, Plaintiff filled out a religious diet request on form CDCR 3030. ECF No. 7 at 7.  Plaintiff listed his faith as Jewish and his religious group as "non-affiliated." ECF No. 7 at 7.  Form CDCR 3030 listed two religious meal options: vegetarian or kosher. Plaintiff circled option 1-vegetarian." ECF No. 7 at 7.  Form CDCR 3030 asked: "Can your religious dietary needs be met by not eating pork, and/or following a vegetarian diet?"  Plaintiff answered, "Yes, Rabbi, I have hyper lipidemia (high cholesterol) Dr. Enemoh instructed me to abstain from peanut butter margerine and cheese. I'm a vegetarian. The Kosher evening meal largely red meat, processed meat plus soy is intolerable. Therefore, I must now seek a total vegetarian diet to meet my nutritional needs. I do however wish to continue to get a kosher lunch and breakfast minus the cheese, peanut butter and lunch meat if possible, if not option 1 please. Thank you." (Emphasis original).  ECF No.

---

[4] R. Gomez is an appeals coordinator at SATF. Gomez Decl. ¶ 1. The declaration is taken from Defendant's motion to dismiss, filed April 8, 2010.

6

7 at 7.

Plaintiff refuses to eat beans in excess, butter, margarine, peanut butter or cheese for health reasons. Pl.'s Dep. 18:14-19:16; ECF No. 7 at 7, 12. Beans, butter, margarine, peanut butter and cheese are contained in both the Jewish Kosher diet as well as the Religious Vegetarian diet. Maurino Decl. ¶ 11. Plaintiff believes that chicken is part of the Religious Vegetarian diet because it is "not considered meat." Pl.'s Dep. 63:1-5. Plaintiff is not a vegetarian for religious reasons. *Id.* at 15: 4:24; 18:14-19:16.

A vegetarian diet is not inconsistent with Plaintiff's religious belief, so long as the food is blessed by a rabbi. Pl.'s Dep. 16:10-19. The Torah does not require or prohibit vegetarianism, or require the eating of meat. Moskowitz Decl. ¶ 6.[5] Plaintiff's religious beliefs prevent him from eating non-kosher foods. Pl.'s Dep. 15:4-24. Plaintiff was approved for the Religious Vegetarian diet on September 16, 2008. ECF No. 7, at 7. Attached to the approval for the Religious Vegetarian diet was a form CDC 128B (chrono) by Jewish Chaplain Sharon stating: 1) Plaintiff is approved for the Religious Vegetarian diet; 2) Plaintiff is not approved for the Jewish Kosher diet. ECF No. 7 at 8. Chaplain Sharon determined that Plaintiff was not Jewish and therefore not entitled to the Jewish Kosher diet because Plaintiff told him that Plaintiff's mother was not Jewish and that he had not gone through conversion supervised by a Rabbi. ECF No. 7 at 8. Pl.'s Dep. 56:5-58:19.

To be Jewish, one must be either be born of Jewish blood or go through a formal conversion process under the supervision of a Rabbi in a faithful Jewish congregation or community. There is no process of self-conversion in the Jewish tradition. Moskowitz Decl. ¶ 4. Chaplin Sharon wrote on the CDC 128C form: "Eric Burton, when you are released from your current custody status, you are welcome to come to Jewish Services and classes if you wish." ECF No. 7 at 8. Weekly Jewish services, celebrations of Jewish Holy Days as well as classes on Judaism were available to all CSATF inmates (Jewish or not), subject to security concerns. Def. Clark Decl. ¶ 4; Pl.'s Dep. 45:20-25.

After being approved for the Religious Vegetarian diet, Plaintiff received vegetarian meals

---

[5] L. Moskowitz is a Jewish Chaplain at the California Men's Colony, the Chaplaincy Commissioner for the California Board of Rabbis, the Jewish representative of the State Advisory Committee on Institutional Religion, the Jewish representative of the CDCR Chaplains' Coordinating Committee, and the Chaplains' Occupational Chairperson of Local 2620 of the American Federation of State, County, and Municipal Employees. He is also the CDCR liaison to the Jewish Kosher Food Program. Moskowitz Decl. ¶ 1.

7

1  (except on one occasion when he was served a tray meant for another inmate named McCarthy.)
2  Pl.'s Dep. 32:23-35:10; 63:17-64:4.  On October 6, 2008, Plaintiff filed an inmate appeal log number
3  SATF-C-08-5421, complaining that 1) he was sent McCarthy's meal tray containing pork by
4  mistake; 2) his meals must be blessed by a Jewish Rabbi; 3) he "was hoping to get fish today for
5  dinner;" and 4) he has gotten beans six days in a row.  ECF No. 7 at 12; ECF No. 24-2 at 3, 29.
6  Plaintiff claims the meat "smelled like pork" but admitted he does not know if it was pork.  Pl.'s
7  Dep. 35:4-17.  CSATF does not serve pork or pork products.  Cal. Code Regs. tit 15, § 3051;
8  Maurino Decl. ¶ 5.

9       Plaintiff insists that vegetarian meals must be blessed by a Jewish Rabbi to be kosher. Pl.'s
10 Dep. 16:17-17:4; ECF No. 7 at 12.  Jewish Rabbis do not bless vegetables to make them kosher. A
11 Rabbi's blessing does not make non-kosher foods kosher. Therefore, a vegetarian meal made kosher
12 by the blessing of a Jewish Rabbi is not available.   Moskowitz Decl. ¶ 7.

13      On October 10, 2008, Plaintiff filed an inmate appeal log number SATF-C-08-5154
14 complaining that he is being discriminated against because Chaplin Sharon determined that he is not
15 Jewish and therefore is not entitled to a Jewish Kosher diet.  ECF No. 24-2 at 3, 29.  Defendant
16 Clark reviewed Plaintiff's appeal number SATF-C-08-05154 at the second level.  In reviewing of
17 Plaintiff's appeal, Defendant Clark entirely relied on Chaplin Sharon's judgment and his
18 determination that Plaintiff was not eligible to participate in the Jewish Kosher diet program.  Clark
19 Decl. ¶ 3.  Defendant Clark did not make the determination (or issue any policy) affecting whether
20 Plaintiff or any other inmate was entitled to participate in the religious dietary program.  *Id.* ¶ 2.

21      CDCR creates the inmate menus and determines what food is served in accordance to the
22 Religious Diet program. The Jewish Kosher diet contains red meat, as well as chicken and fish. Had
23 the department opted to provide only kosher vegetarian food for the Jewish Kosher diet, it would
24 have severely limited the foods served and the variety of the menus, or in the alternative, compelled
25 each prison to cook kosher food, which would have significantly burdened food service operations.
26 CDCR purchases its Jewish Kosher meals from one of the major food vendors—U.S. Foodservice,
27 Sysco, and Highland Wholesale Foods. These food vendors have a few lines of kosher vegetarian
28 entrees, but they do not offer the breadth of foods necessary for a balanced diet.  Maurino Decl. ¶ 8.

1  The California Department of General Services is responsible for negotiating the purchase of food for CDCR prisons. The Department of General Services manages a competitive bidding process requiring food brokers to compete for contracts to supply food to CDCR prisons. CDCR's food brokers and food vendors are registered with the State of California and their foods have been vetted for safety and quality. By purchasing bulk quantities of food from registered food brokers and vendors, CDCR is able to take advantage of economies of scale and efficiently provide nutritious meals to its inmates at a low cost. *Id.* ¶ 9.

If CDCR purchased special meals for a small group of inmates, CDCR would forego the cost savings of purchasing food in bulk from one of the major food brokers or vendors. *Id.* ¶ 10. If CDCR purchased food from a non-registered vendor that has not been vetted for food safety and quality, CDCR could increase the possibility of food borne illnesses. *Id.* To accommodate Plaintiff's requests for a kosher vegetarian diet without beans in excess, butter, margarine, peanut butter or cheese, and with chicken and fish, CDCR would have to invent an entirely new menu tailored to Plaintiff and run tests to determine its nutritional value. No nutritional study has been done on such a menu. No approved CDCR vendors offer such a menu. *Id.* ¶ 11.

Plaintiff's meals would have to be prepared on site, especially for him. Because he wants kosher food, preparation would require separate utensils, dishes, and storage to ensure no contact of meat and dairy foods. This would require a separate kitchen and a kosher kitchen staff, as well as a separate kosher food supplier for the ingredients. To set up a separate menu, kitchen, storage, kitchen staff and food vendor for Plaintiff would be a tremendously expensive burden to CDCR. Maurino Decl. ¶ 11.

Because Plaintiff's requested special kosher diet would require individual preparation and service, it would entail significant additional labor cost. The labor cost for a correctional supervising cook to prepare, serve, and cleanup Plaintiff's specially prepared meals three times a day would be approximately $28,740 to $37,960 per year (calculated using a base salary of $20 per hour for a correctional supervising cook salary, plus 30% for employee benefits, for three to four hours per day, 365 days per year). Maurino Decl. ¶ 12. The estimated cost of purchasing the ingredients to prepare Plaintiff's special kosher diet from is approximately $26.03 per day or $9,500.95 per year. *Id.*

The labor cost of a prison employee shopping for Plaintiff each week at a kosher food market would be $9,464 to $10,816 per year (calculated using a base salary of $20 per hour for a correctional supervising cook salary, plus 30% for employee benefits, for seven to eight hours per week, fifty-two weeks per year). *Id.* In addition, because the prison would need to set up a kosher kitchen, the prison would need to purchase separate utensils and storage lock boxes at an approximate cost of $2,600 in order to prepare and secure Plaintiff's requested foods. *Id.*

The total cost for ordering, preparing, delivering, and storing Plaintiff's requested special kosher diet would be approximately $52,554.95 to $63,126.95 per year (based on the $9,464 to $10,816 labor cost of shopping for the food, the $28,740 to $37,960 labor cost of preparing the food, and the $9,500.95 cost of purchasing the food, and $2,600 for separate utensils and storage lockers.) This figure does not include the cost of gas and vehicle wear and tear in making trips to a kosher food market. *Id.* ¶ 13.

CDCR's total yearly food budget is approximately $240 million, which includes the direct cost of the food and the labor cost related to the food. CDCR is responsible for feeding 145,000 inmates within this budget. A $240 million annual budget equates to an average cost of $1,655 per inmate per year. Accommodating Plaintiff's request for his special kosher meals at a yearly cost of $52,554.95 to $63,126.95 would inevitably impact CDCR's ability to accommodate other inmates' religious dietary needs. CDCR's food budget is a finite sum of money that must provide for all of the CDCR inmates' dietary needs and it is unrealistic for an inmate to expect his religious dietary beliefs to be accommodated at a yearly cost of $52,554.95 to $63,126.95 while the average cost per inmate is $1,655. *Id.* ¶ 14.

CDCR is financially and operationally unable to provide for every type of unique religious diet that inmates request. CDCR's inmate population consists of approximately 145,000 prisoners who practice a wide variety of religions. Some of the faiths represented within CDCR include Islam, Judaism, Hinduism, Confucianism, Taoism, Sikhism, Baha'i, Jainism, Shinto, Zoroastrianism, Neo-Pagans (including Wiccans), Rastafarianism, Native-American religions, and various denominations of Christianity. Giving Plaintiff a specialized diet option within CDCR would likely encourage other inmates to request their own specialized diets and defeat the purpose of running a simplified,

1 inexpensive, and easily administered food service for inmates. *Id.* ¶ 15.

2 **IV.    Analysis**

3     **A.    Deposition Testimony**

4 Plaintiff requests that the Court strike Plaintiff's deposition testimony on the following grounds: 1) Plaintiff's legal blindness, 2) Plaintiff testifying against himself in violation of the Fifth Amendment, and 3) Plaintiff did not feel free to leave during his deposition. Pl.'s Opp'n 2, ECF No. 56.

8 By separate order, the Court had denied Plaintiff's motion for appointment of counsel because of Plaintiff's legal blindness. ECF No. 64. Defendant contends that Plaintiff has admitted that he sees well enough to read and write. Def.'s Reply 3:11; Pl.'s Dep. 10:7-17. Plaintiff writes well enough to file numerous actions pro se.[6] Plaintiff's eyesight is sufficient to prepare and file legal documents in this case. Thus, Plaintiff's legal blindness is not grounds to strike Plaintiff's deposition testimony.

14 Plaintiff contends that he should have had counsel present during his deposition. Pl.'s Opp'n 2. Plaintiff had previously filed a motion seeking appointment of counsel for purposes of his deposition to protect his Fifth Amendment right against self-incrimination. ECF No. 44. The right protects the person asserting the privilege from compelled self-incrimination. *United States v. Doe*, 465 U.S. 605, 610 (1984). Plaintiff has not explained or demonstrated how any part of his deposition has been used against Plaintiff in a criminal proceeding. This is not grounds for striking Plaintiff's deposition testimony.

21 Plaintiff contends that he did not feel free to leave, being instructed to stay seated until he was removed. Pl's Opp'n 2. Plaintiff then cites to *Miranda v. Arizona*, 384 U.S. 436 (1966), which the Court construes as Plaintiff contending that he had been taken into custody relating to a criminal charge and required appointment of counsel. Again, there is no evidence presented by Plaintiff that he was being questioned pursuant to a criminal proceeding. "[S]tandard conditions of confinement

---

[6] The Court takes judicial notice of the following cases filed in the Eastern District of California: 1. *Burton v. Director of the CDCR*, 1:08-cv-00190-OWW -WMW (HC); 2. *Burton v. Clark*, 1:09-cv-00061-AWI -DLB (PC) [this action]; 3. *Burton v. Clark, et al.*, 09-cv-01360-GSA (PC); 4. *Burton v. McDonald*, 1:10-cv-00904-SMS (PC); 5. *Burton v. Clark*, 2:06-cv-02176-FCD-DAD (HC); 6. *Burton v. Hernandez, et al.*, 2:07-cv-00267-LDG (PC); 7. *Burton v. McDonald*, 2:10-cv-01281-GGH (PC); 8. *Burton v. Cate*, 2:11-cv-01616-MCE -CKD (PC); and 9. *Burton v. McDonald*, 2:11-cv-02187-KJN (PC).

and associated restrictions on freedom will not necessarily implicate the same interests that the [United States Supreme] Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation. Thus, service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." *Howes v. Fields*, 132 S. Ct. 1181, 1191 (2012).

Accordingly, Plaintiff's arguments to strike his deposition testimony are denied.

### B.     Free Exercise of Religion

The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (citing *O'Lone v. Shabazz*, 482 U.S. 342 (1987)); *see Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  Beliefs which are both sincerely held and rooted in religious beliefs trigger the Free Exercise Clause if such beliefs are burdened.  *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008) (citing *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994)); *Callahan v. Woods*, 658 F. 2d 679, 683 (9th Cir. 1981)).

Under this standard, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see O'Lone*, 482 U.S. at 349 (applying *Turner* to Free Exercise claims). First, "there must be a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it," and "the governmental objective must itself be a legitimate and neutral one." *Turner*, 482 U.S. at 89.  A second consideration is "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90 (internal quotations and citation omitted).  A third consideration is "the impact accommodation of the asserted right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.*

Defendant contends that: 1) Plaintiff's request for a vegetarian diet free of excess beans, butter, margarine, peanut butter, and cheese, with occasional chicken and fish, is not religious in nature; and 2) the First Amendment does not entitle Plaintiff to receive a special, Kosher, vegetarian

diet.

### 1. Burden on Religious Beliefs

Defendant contends Plaintiff's request for a specific vegetarian diet was done for health reasons, not religious. In March of 2007, Plaintiff had been approved for kosher meals, but disliked the quality of meals that he received and requested a change. On the CDC 3030 form for religious diet submitted on September 8, 2008, Plaintiff requested a change from the kosher diet to the vegetarian diet specifically because he did not want excess beans, butter, margarine, peanut butter, and cheese. Plaintiff listed health reasons as the purpose for his decision. Rabbi Moskovitz declares that the religious vegetarian diet is not inconsistent with the dietary requirements of the Jewish faith. Plaintiff rejected the meat selection in the kosher dinner as being composed of too much red meat, processed meat, and soy.

However, there remains a genuine dispute of fact as to Plaintiff's beliefs regarding what kind of meal he should be receiving. Plaintiff wanted all his meals to be blessed by a rabbi in order for his meals to be kosher. A declaration from Rabbi Moskovitz indicates that the blessing of a rabbi cannot make a non-kosher meal kosher. Thus, a rabbi-blessed vegetarian meal is not available. There are sufficient facts, however, to demonstrate that Plaintiff sincerely believes that his meals should be blessed by a rabbi to be deemed kosher. Plaintiff submitted an inmate grievance shortly after being approved for the religious vegetarian diet, complaining that his meal had not been blessed by a rabbi. Whether or not this is an accurate belief in relation to the Jewish faith is not controlling; the focus is on whether Plaintiff sincerely believes this to be true. *Shakur*, 514 F.3d at 885. Accordingly, summary judgment will not be granted on this ground.

### 2. *Turner* Factors

Defendant further contends that Plaintiff's rights under the First Amendment were not violated, pursuant to *Turner*. Def.'s Mem. P. & A. 12:26-25:5.

#### a. Rational Connection Between Regulation and Legitimate Government Interest

Defendant contends that the prison has a legitimate interest in running a simplified food service. A simplified prison menu allows CDCR to purchase in bulk from registered food brokers

13

1   and vendors, and efficiently provides nutritious meals to inmates at low cost.  Purchasing special

2   meals for small groups of inmates would negate the savings provided by bulk food purchases.

3     Simplicity and economy in prison food service is a legitimate government interest. *Ward v.*

4   *Walsh*, 1 F.3d 873, 877-79 (9th Cir. 1993). The regulations limiting inmates to a choice between

5   three dietary programs is logically connected to the legitimate government interest of simplicity and

6   economy. "The prison has a legitimate interest in running a simplified food service, rather than one

7   that gives rise to many administrative difficulties. [citation]. Since the policy of not providing special

8   diets is related to simplified food service, the first factor weighs in favor of the government." *Ward*,

9   1 F.3d at 877 (citing *Kahey v. Jones*, 836 F.2d 948, 950 (5th Cir. 1988) (prison not required to

10  provide full Kosher diet where doing so would be administratively unfeasible)).

11    Based on the undisputed facts, construed in the light most favorable to the non-moving party,

12  the first *Turner* factor weighs in favor of Defendant.

13      **b.  Alternative Means of Exercise of his Rights**

14    The undisputed facts indicate that Plaintiff had many means of practicing his Judaism at

15  CSATF, including weekly Jewish services, celebrations of Jewish Holy Days, and classes on

16  Judaism.  Chaplain Sharon welcomed Plaintiff to come to Jewish services and classes upon his

17  release from his current custody status.

18    "The relevant inquiry under this factor is not whether the inmate has an alternative means of

19  engaging in the particular religious practice that he or she claims is being affected; rather, we are to

20  determine whether the inmates have been denied all means of religious expression." *Ward*, 1 F.3d at

21  877 (citing *O'Lone*, 482 U.S. at 351-52).  Here, the second *Turner* factor weighs in favor of

22  Defendant.

23      **c.  Accommodation's Impact on Staff, Other Inmates, and Prison Resources**

24    The undisputed facts indicate that the accommodation for Plaintiff would have a significant

25  ripple effect on fellow inmates and prison staff. To accommodate Plaintiff's requests for a kosher

26  vegetarian diet without beans in excess, butter, margarine, peanut butter, or cheese, and with chicken

27  and fish, CDCR would have to invent an entirely new menu tailored to Plaintiff and run tests to

28  determine its nutritional value.  No approved CDCR vendors offer such a menu. Thus, meals would

have to be prepared on site, especially for him.

Because Plaintiff wants kosher food, preparation would require separate utensils, dishes, and storage to ensure no contact of meat and dairy foods. This would require a separate kitchen and a kosher kitchen staff, as well as a separate kosher food supplier for the ingredients. To set up a separate menu, kitchen, storage, kitchen staff and food vendor for Plaintiff would be a tremendously expensive burden to CDCR. Because the prison would need to set up a kosher kitchen, the prison would need to purchase separate utensils and storage lock boxes at an approximate cost of $2,600 in order to prepare and secure Plaintiff's requested foods. Labor to prepare Plaintiff's meals would be approximately $29,000 to $38,000 per year. Labor to shop for Plaintiff's meals would be from $9,000 to $10,000.

Ordering Plaintiff's special diet would cost approximately $52,000 to $63,000 per year. CDCR's food budget is $240 million per year, at an average of $1,655 per inmate. Accommodating Plaintiff's dietary request would impact CDCR's ability to accommodate other inmates. Changing the Kosher diet to accommodate Plaintiff' special dietary requests would greatly impact the meals provided to inmates receiving the Jewish kosher diet. Inmates of other religions will be encouraged to request special diets, defeating the purpose of running a simplified, inexpensive, and easily administered food service.

Here, the third *Turner* factor weighs in favor of Defendant.

### d.  Absence of Obvious, Easy Alternatives

Plaintiff has the burden of demonstrating that there are obvious, easy alternatives to the regulation. Under the fourth *Turner* factor, absence of ready alternatives is evidence of reasonableness of a prison regulation. *Turner*, 482 U.S. at 90. The inmate-plaintiff may "point to an alternative that fully accommodate the prisoner's rights at de minimis cost to valid penological interests." *Id.* at 91. The undisputed facts indicate that the three CDCR dietary options are related to the legitimate penological goals of running a simplified food system, controlling costs, and providing nutritional and safe food. Plaintiff has not presented, nor do the undisputed facts demonstrate, any ready alternatives to the current CDCR dietary options. The fourth *Turner* factor weighs in favor of Defendant.

1 Accordingly, even construing the facts in the light most favorable to Plaintiff as the non-moving party, there are no genuine disputes of any material fact regarding Plaintiff's Free Exercise claim. Defendant Clark is entitled to judgment as a matter of law as to this claim.

### C. RLUIPA

Plaintiff seeks both monetary damages and injunctive relief. Defendant contends that Plaintiff is not entitled to monetary damages for his RLUIPA claim. Def.'s Mem. P. & A. 19:9-20:4. RLUIPA claims are brought against governmental entities. *See* 42 U.S.C. § 2000cc-1(a) ("No *government* shall impose a substantial burden on the religious exercise of a person . . . .) (emphasis added); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1077 (9th Cir. 2008) ("RLUIPA, by its terms, prohibits only state and local governments from applying regulations that govern land use or institutionalized persons to impose a 'substantial burden' on the exercise of religion.")

A RLUIPA claim against Defendant Clark would thus be brought against Defendant Clark in his official capacity. Claims against prison officials in their official capacity are essentially claims against the government entity that employs him, in this instance, the state. *Hafer v. Melo*, 502 U.S. 21, 26 (1991); *Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1111 (9th Cir. 2010).

State officials sued in their official capacity are immune from suits for damages under the Eleventh Amendment. *Flint v. Dennison*, 488 F.3d 816, 824-25 (9th Cir. 2007). The United States Supreme Court found that states have not waived their Eleventh Amendment immunity from damages under RLUIPA. *Sossamon v. Texas*, 131 S. Ct. 1651, 1658-60 (2011). Thus, Plaintiff's RLUIPA claim for damages against Defendant Clark in his official capacity is barred by the Eleventh Amendment.

Defendant further contends that Plaintiff cannot receive injunctive relief because he is no longer incarcerated at CSATF. Def.'s Mem. P. & A. 20:7-11. Thus, Defendant Clark is no longer the proper Defendant. As of the date of issuance of these Findings and Recommendations, Plaintiff is incarcerated at High Desert State Prison in Susanville, California. Transfer to another prison renders the request for injunctive relief moot absent some evidence of an expectation of being transferred back. *Andrews v. Cervantes*, 493 F.3d 1047, 1053 n.5 (9th Cir. 2007). Thus, Plaintiff's RLUIPA claim for injunctive relief is also moot.

Defendant finally contends that Plaintiff has failed to demonstrate a substantial burden on the exercise of his religious beliefs. Def.'s Mem. P. & A. 20:14-22:3.

The RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution…even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person–(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a). "RLUIPA defines 'religious exercise' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Greene v. Solano County Jail*, 513 F.3d 982, 986 (9th Cir. 2008) (quoting 42 U.S.C. § 2000cc-5(7)(A)). Plaintiff bears the initial burden of demonstrating that defendants substantially burdened the exercise of his religious beliefs. *Warsoldier v. Woodford*, 418 F.3d 989, 994-95 (9th Cir. 2005). "A 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Id.* at 995 (citing *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).

Based on the undisputed facts, Plaintiff stated in his CDCR 3030 form that his religious dietary needs could be met by not eating pork or following a vegetarian diet; Plaintiff chose the Religious Vegetarian diet option because he is predominately a vegetarian and did not like the Jewish Kosher menu; and Plaintiff had alternate ways to practice Judaism. Additionally, RLUIPA does not elevate accommodation of religious observances over the institution's need to maintain order and safety. *See Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005) (finding that Congress anticipated that courts would apply the "compelling government interest" standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with considerations of costs and limited resources."). Even construing the facts in the light most favorable to Plaintiff as the non-moving party, there is no genuine dispute of material fact. Defendant has met his burden of demonstrating that there was no substantial burden on Plaintiff's exercise of his religious beliefs.

Accordingly, Defendant is entitled to judgment as a matter of law regarding Plaintiff's RLUIPA claim.

**D.     Qualified Immunity**

Because the Court finds that Defendant is entitled to summary judgment, it declines to address Defendant's arguments for qualified immunity.

**V.     Conclusion and Recommendation**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendant's motion for summary judgment, filed January 17, 2012, should be granted in full;
2. Summary judgment should be entered in favor of Defendant Clark and against Plaintiff for all claims; and
3. Judgment should be entered accordingly.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  A party may respond to another party's objections by filing a response within **fourteen (14) days** after being served with a copy of that party's objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **August 2, 2012**                    /s/ *Dennis L. Beck*
                                                                          UNITED STATES MAGISTRATE JUDGE